## Miller, Appellant, v. Hawkins.

Argued October 12, 1964. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused December 28, 1964.

*John W. English,* with him *John A. Bowler,* and
*English, Gilson, Bowler, Shamp & Levin,* for appel-
lants.

*R. T. Mutzabaugh,* with him *Mutzabaugh & Mutza-
baugh,* for appellees.

OPINION BY MR. JUSTICE JONES, November 24, 1964:
These three appeals attack, respectively, the va-
lidity of two decrees and an order of the Orphans'
Court of McKean County entered in three separate ac-
tions all bottomed upon alleged misconduct on the part
of Harriet Miller Hawkins while acting as the execu-
trix of the Estate of W. B. Miller, deceased.[1]

W. B. Miller (decedent), a McKean County resi-
dent, died, testate, on November 25, 1936. By will, he
disposed of his estate in the following manner: 15%
to his brother Frank Miller, 15% to his sister Lillie
Oliver, 55% to his wife Harriet Miller (later Mrs.
Hawkins), and 15% to his brother Glenn Miller.
Glenn Miller predeceased decedent leaving a wife, Au-
tumn Miller (later Autumn Orso), and four children
(the present appellants), all of whom were minors
when decedent died.[2] Harriet Miller (Mrs. Hawkins),

---

[1] In this opinion we refer to the executrix as Mrs. Hawkins
although, during part of the time, she administered the estate as
Harriet Miller.

[2] The oldest appellant became twenty-one in 1940 and the
youngest appellant in 1944; during the appellants' minority the
National Bank and Trust Company of Erie acted as their court-
appointed guardian. These four children inherited Glenn Miller's
interest.

was named and served for 25 years as sole personal representative of decedent's estate.

Among decedent's assets were: (1) fee-owned tracts of oil producing land situated in McKean County; (2) a lease-hold interest in an eight acre tract of oil producing land in McKean County; (3) a ⅜ths interest in a partnership known as Bradford Petroleum Company (Bradford Petroleum). Assets (1) and (2), known as the "Tip Top Properties" (Tip Top), were non-contiguous properties upon which were located, inter alia, 111 oil wells and 48 water wells. Asset (3) was a ⅜ths interest in a partnership, composed of decedent, one H. W. Loveland and one C. M. Oliver, which owned oil and gas leases and tracts of oil producing land with valuable improvements and equipment thereon located in McKean County. Mrs. Hawkins, as executrix, operated all the properties represented by these assets, including the partnership itself, after decedent's death for many years.

Approximately three years after decedent's death, the National Bank and Trust Company of Erie, (Bank), acting as appellants' guardian, petitioned the Orphans' Court of McKean County for permission to sell, at private sale, appellants' 15% interest in Tip Top for $20,000. By order of that court, on January 25, 1940, appellants' interest in Tip Top was sold to a purchaser, *undisclosed in the sale petition,* Mrs. Hawkins as an individual. Approximately six months after decedent's death, Mrs. Hawkins had purchased the ⅜ths interest of decedent's estate in Bradford Petroleum for a stated consideration of $48,700.99 but an actual consideration of $75,000[3] and, shortly after her marriage to Lynn Hawkins, she transferred this

---

[3] This sale took place *before* the appraisal of this asset for tax purposes. *After* the tax appraisal of this asset at $75,000 Mrs. Hawkins paid the difference between $48,700.99 and $75,000 and claimed in her account such difference as a net gain.

⅜ths interest in Bradford Petroleum to Lynn Hawkins as a gift.

On December 12, 1946, the appellants—having all then attained their majority—petitioned the Orphans' Court of McKean County (25 December Term, 1946) to set aside the Bank's 1940 deed of conveyance of appellants' interest in Tip Top, for an accounting and to have Mrs. Hawkins declared a constructive trustee of their interest in Tip Top. Hearings on this petition were not held until June and July of 1960—fourteen years later—and Judge HUBBARD, the then President Judge of the Orphans' Court of McKean County, on December 23, 1963, entered a decree nisi dismissing appellants' petition. On March 31, 1964, Judge MENCER, the present President Judge, affirming Judge HUBBARD, entered a final decree from which an appeal has been taken (246 March Term, 1964).

On June 1, 1954, appellants petitioned the Orphans' Court of McKean County (27 June Term, 1954) to set aside the sale of decedent's interest in Bradford Petroleum, for an accounting and a declaration that Mrs. Hawkins, Lynn Hawkins and all subsequent transferees of said interest be declared constructive trustees. Hearings on that petition were held in July 1960—six years later—and again President Judge HUBBARD on December 27, 1963, entered a decree nisi dismissing appellants' petition and on March 31, 1964, President Judge MENCER, affirming Judge HUBBARD, entered a final decree from which an appeal has been taken (247 March Term, 1964).

Mrs. Hawkins died, testate, on June 10, 1961, and, under her will, Lynn Hawkins, her husband, was named executor of her estate. *Two days after the expiration of the twelve month period,* subsequent to the last advertisement of the grant of letters testamentary but prior to filing any inventory or account in the estate, Lynn Hawkins distributed all the assets of the

Estate of Mrs. Hawkins to the persons entitled under
her will. On August 19, 1963, appellants petitioned
the Orphans' Court of McKean County (18 October
Term, 1963) to require Lynn Hawkins to file an ac-
counting of his administration of the estate and to
file surety bonds; after hearing, the court directed
that Lynn Hawkins file such accounting and post sure-
ty bonds totalling $350,000. Thereafter, Lynn Hawkins,
having failed to file surety bonds in accordance with
the court order, was held in contempt of court. In De-
cember 1963 the appellants cited Lynn Hawkins and
those persons to whom distribution of the Estate of
Mrs. Hawkins had been made to show cause why the
assets distributed to them should not be returned to
the court and also to show cause why the person of
Lynn Hawkins should not be attached for contempt.
On March 31, 1964, President Judge MENCER dismissed
both petitions and from that order an appeal has been
taken (273 March Term, 1964).

This consolidated record indicates that, in the first
two actions, appellants seek restoration of their inter-
ests in decedent's estate which they claim were ille-
gally and improperly disposed of by Mrs. Hawkins
acting as fiduciary for the Miller Estate and, in the
third action, appellants seek to preserve the assets of
the Mrs. Hawkins Estate until such time as their
claims in the first two actions are established.

Action To Set Aside Guardian's Sale of Appellants'
Interest in Tip Top (246 March Term, 1964)

In this action, the 1946 action, appellants endeav-
ored to set aside the 1940 court-approved guardian's
sale of their interest in Tip Top to Mrs. Hawkins per-
sonally. The basis of this action was that Mrs. Haw-
kins, while acting as fiduciary of the Miller Estate,
improperly induced the Bank, guardian of appellants'

interests, to sell appellants' interest in Tip Top to her for $20,000, an unfair, inadequate and improvident consideration; that, by fraud, misrepresentation and concealment of essential facts, the Bank was induced to request the court to approve the sale; that the court was misled, by misrepresentation, fraud and concealment, to approve the sale; that, by reason thereof, the sale should be set aside and appellants restored to their rights.

After decedent's death and until the guardian's sale, Mrs. Hawkins, as executrix, *exclusively* managed and operated the Tip Top properties and, from such experience, knew not only the then value but the potential value of Tip Top.[4] During such period, Mrs. Hawkins made some disbursements—comparatively small in amount—on appellants' interest to the guardian Bank but she never furnished any statement to the Bank showing receipts and expenditures in reflection of the Tip Top operation *until after the guardian's sale*.[5]

In the meantime, the pattern of things to come was shaping. Shortly after decedent's death, Mrs. Hawkins approached Autumn Miller, appellants' mother, (whom Mrs. Hawkins and her counsel mistakenly believed had a 1/3 of appellants' 15% interest), and, in an effort to purchase her interest, told her that Lillie Oliver—owner under the Miller will of a 15% interest—had agreed to sell her interest for $20,000. It is uncontradicted that Lillie Oliver had never agreed to

---

[4] Until July 1937 Mrs. Hawkins' brother-in-law acted as superintendent and from August 1937 until sometime after August 1940, Mrs. Hawkins' brother, acted as superintendent. All the income received from Tip Top was turned over to Mrs. Hawkins and all payments made in connection with Tip Top were made by her.

[5] During this period of time, Tip Top produced a net profit allocable to appellants' interests in excess of $38,000; such fact was known to the executrix but not revealed to the guardian.

sell her interest. The same misrepresentation was made by Mrs. Hawkins by letter to the Bank. Sometime thereafter, Mrs. Hawkins' counsel misrepresented by letter to the guardian Bank that Lillie Oliver had given an option for the purchase of her interest. While it is true that Frank Miller—holder of another 15% interest—had sold Mrs. Hawkins his interest for $20,-000, the misrepresentations to the guardian Bank and appellants' mother as to Lillie Oliver were untrue and obviously made to induce them to believe in the adequacy of the price of $20,000 and the suitability of a sale. Moreover, as a possible "club" to induce the sale, Mrs. Hawkins' counsel represented to the guardian that the Miller estate held a $1100 mortgage against its wards' mother's property although Mrs. Hawkins well knew such mortgage, at decedent's suggestion, had been placed on the property simply to enable appellants' mother to secure mother's assistance from the Commonwealth and was not a valid mortgage.

While the Bank's vigilance left much to be desired,[6] it is clear beyond question that the sale of appellants' Tip Top interest was initiated through the machinations of Mrs. Hawkins. A more sordid example of a fiduciary's self-dealing with estate assets to deprive minor beneficiaries of the value of their interests can hardly be envisaged!

The petition for the sale of appellants' interest in Tip Top,—which should have set forth all the essential facts necessary to a determination of the propriety of the sale—, by misrepresentation in some instances and concealment in others, understandingly misled the court into approval of the sale. By way of illustration, the petition: (1) stated Tip Top was appraised for federal and state tax purposes at $17,044 whereas such

---

[6] The appellants did not seek a decree against the Bank which was dissolved on May 28, 1951, without any assumption of its liabilities by anyone.

appraisal was $25,566; (2) failed to inform the court that the 8 acre tract of land, in which the estate had a lease-hold interest, had thereon $89,000 in improvements; (3) failed to inform the court that, from the date of decedent's death until presentation of the sale petition, the *net profit* from Tip Top attributable to appellants' interest was $38,771.10;[7] (4) failed to inform the court of the presence on Tip Top of 111 oil wells, 48 water wells and several power plants; (5) failed to inform the court that the purchaser-to-be of Tip Top was the executrix of the estate personally; (6) failed to inform the court of the relationship of one of the two appraisers to the proposed purchaser;[8] (7) misrepresented that 70 acres of Tip Top were "watered out" and "unproductive". Even the advertisement of the proposed sale was misleading in that: (1) it failed to state, contrary to the court's preliminary order, that outsiders could bid on the property; (2) it stated that the interests to be sold were in 138.38 acres whereas, as the subsequent deed indicated, the proper acreage was 161.36 acres; (3) it stated 70 acres were unproductive whereas such acres were most productive. Twenty-three years after it had approved the sale, the court said: "he was not apprised nor aware of pertinent facts omitted in the petition relating to the true extent and nature of this property, the improvements and appurtenances thereto, the personal property located thereon,[9] and the fact that the buyer [Mrs. Hawkins] had initiated the proceedings."

---

[7] The guardian may well have been unaware of this since payment of this amount was not made until *after the sale.*

[8] This appraiser, a co-partner with decedent in a water company, later acted as intermediary in effecting the surreptitious purchase of the estate interest in the water company by Mrs. Hawkins in her own right.

[9] It must be noted that the appellants received $20,000 for their interest in Tip Top. Within the next fourteen years Tip Top's *net profits* were $1,286,510.42 of which appellants' share, had the sale not taken place, would have been $192,976.56.

In the light of the trial court's findings of fact, fully supported by the evidence, and its conclusion that "the sale to the executrix eventuated to the disadvantage of the minors", it is difficult, if not impossible, to reconcile the court's conclusion that the evidence did not clearly show fraudulent intent on Mrs. Hawkins part. With that conclusion we must disagree. Our examination of this record clearly reveals that the guardian's sale was initiated[10] by the executrix in disregard of her fiduciary obligation and in her own self-interest; that the guardian was "duped" into making the sale and the court purposely misled; that the entire proceedings were tainted with fraud; that Mrs. Hawkins was guilty of self-dealing of the rankest sort and, by employment of her fiduciary-acquired knowledge, she obtained for herself for a comparative pittance appellants' interest in Tip Top to the great detriment of her deceased husband's minor nephews and niece. *This sale, vitiated by fraud, must be set aside* unless the reason assigned by the court below, i.e., laches on appellants' part, for dismissal of the action is sound.

In determining the propriety of the application to this action of laches, we bear in mind that the passage of time per se does not impute laches but that prejudice to the defendant must be shown as a prerequisite to the application of the laches doctrine: *Brodt v. Brown*, 404 Pa. 391, 172 A. 2d 152; *Crunk v. Mid-State Theatres, Inc.*, 404 Pa. 22, 170 A. 2d 858; *Greenan v. Ernst*, 393 Pa. 321, 143 A. 2d 32.

The court below (President Judge HUBBARD), in dismissing the action, said: "Twenty years elapsed between January 20, 1940, the date of the order of the court, and the date this case was put down for hear-

---

[10] It is significant that the McKean County counsel who handled the guardian's sale represented, *at the same time*, the Miller Estate *and* Mrs. Hawkins, the purchaser.

ing. We do not wish to imply that *all* the delays should be attributed to plaintiffs, but we do feel that they are *very largely* to be attributed to them." (Emphasis is that of the court below).

In considering whether the court below erred in its application of laches, we must preliminarily note that, *after* the rendition of the decree nisi and *after* appellants were declared guilty of laches, appellants offered as part of the record certain written correspondence beginning in 1948 and ending March 15, 1960, which clearly shows efforts on the part of appellants' counsel to have this matter disposed of expeditiously. President Judge MENCER refused to permit such correspondence to become part of the record. While the matter was within the discretion of the court below, in our opinion this correspondence, so clearly relevant, should have been admitted, particularly in a matter where fraud and misrepresentation is so evident. The court below abused its discretion in ruling against the admission of such correspondence.

In determining whether laches is applicable in the case at bar certain facts must be noted: (a) when the sale took place all the appellants were under the legal disability of minority; (b) all the male appellants served in the armed services, one 1942-1952, another 1945-1946 and another 1942-1945; (c) after institution of suit, Mrs. Hawkins and the Bank filed preliminary objections *which were not disposed of until two years later by the court*; (d) between 1949 and 1954 appellants were required to obtain new counsel; (e) efforts to obtain answers to interrogatories were thwarted by appellees' counsel; (f) the correspondence indicates repeated efforts to have a date set for trial over a period of several years, such efforts being in vain because of the court's illnesses, previous engagement of appellees' counsel, etc.; (g) even though hearings were completed in July 1960, no adjudication was

made by the court until 1963—almost two and one-half years after the hearings. Under these circumstances blame for delay cannot be placed entirely or even "very largely" on appellants; our review of the record indicates responsibility for such delay must be shared by all the parties and the court alike.

Prejudice is claimed by appellees due to the deaths of the Bank's trust officer, the Bank's counsel, counsel for both the Miller Estate and Mrs. Hawkins, the secretary for such counsel and the appraisers as well as Mrs. Hawkins' illness at the time of trial. However, only two of such witnesses died *after* institution of the suit[11]—the Bank's trust officer and the Bank's counsel. However, the assistant trust officer was called and testified, and we cannot assume that the testimony of the Bank's counsel would be antagonistic to the former Bank's wards. We are satisfied that appellees were not prejudiced by the lapse of time and certainly not to the extent to justify a dismissal of this action. The sole reason assigned for dismissal of this action, i.e., laches, is not supported by the record.

Our study of this record convinces us that the sale of appellants' interest in Tip Top was engineered by Mrs. Hawkins, that such sale constituted a fraud on the court as well as appellants and that the sale must be set aside and the parties restored so far as possible to the status in existence at the time of the sale.

Decree reversed and the matter remanded to the court below for action consonant with the views expressed in this opinion. Costs on Mrs. Hawkins' Estate.

---

[11] Counsel for the estate died two months after the sale, his secretary in 1943, the appraisers in 1944 and 1945.

## Action To Set Aside Purchase by Decedent's Fiduciary of Decedent's Interest in Bradford Petroleum

Within six months of decedent's death and prior even to the filing of an inventory in the Miller Estate, Mrs. Hawkins purchased from the surviving partners for her own interest, for a recited consideration of $1 but an actual consideration of $75,000, decedent's 3/8ths interest in Bradford Petroleum. The acquisition of this 3/8ths interest from the estate by the executrix personally was accomplished without notice to the appellants, to their guardian and without any notice to, petition to, or allowance by, the court. Approximately five weeks subsequent to said purchase, Mrs. Hawkins, as executrix, filed an inventory and appraisal of the value of the personal property of decedent and, in said inventory and appraisal, the 3/8ths interest in Bradford Petroleum was appraised at $48,700.99.[12] When Mrs. Hawkins filed her first and partial account she set forth as an additional charge against herself an alleged gain of $26,299.01 resulting from a sale of the 3/8ths interest in Bradford Petroleum, *although she did not divulge the fact that she had been the purchaser.* During the period from the date of decedent's death to the date of Mrs. Hawkins acquisition of the interest in Bradford Petroleum, the net operating profit of Bradford Petroleum before depletion and depreciation allocable to the 3/8ths interest was $21,588.24 for which no accounting whatsoever was made either to the court, the Bank or appellants. The oil properties owned by Bradford Petroleum had then a daily average production of over 125 barrels of crude oil and from the time of decedent's death to 1954 the properties produced over 579,000 barrels of crude oil.

---

[12] The appraisers were employees of Bradford National Bank in which Mrs. Hawkins and H. W. Loveland were stockholders and of which bank H. W. Loveland was president.

On December 31, 1942, Mrs. Hawkins, without consideration and as a gift, conveyed the interest which she had acquired in Bradford Petroleum to her husband, Lynn Hawkins. On January 14, 1953,—after years of highly profitable operation of Bradford Petroleum—Lynn Hawkins, joined by his wife, Mrs. Hawkins, and the other partners—H. W. Loveland and C. M. Oliver—conveyed their interest in certain of the properties of Bradford Petroleum to South Penn Oil Company and the United Refining Company for a recited consideration of $135,000 but an actual consideration of $150,000.

Even though the court found that the alleged fraud and breach of trust complained of by appellants were not discovered by them until February 27, 1954, and even though this action was instituted on June 1, 1954, the action was dismissed on the ground of laches for failure of diligent prosecution.

Our examination of this record compels us to the same conclusion reached in the 1946 action, i.e.,—that the delay in prosecuting this litigation should be visited equally upon the appellants, the appellees and the court. In dismissing this action on the ground of laches the court below fell into error.

The action of the fiduciary in purchasing for her own interest the decedent's interest in Bradford Petroleum was flagrant self-dealing. In *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, the late Mr. Justice (then Judge) CARDOZO said: "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. [citing a

case]. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court." A fiduciary may not profit at the expense of the estate or its beneficiaries (*Steele Estate,* 377 Pa. 250, 257, 103 A. 2d 409) and the rule forbidding self-dealing is inflexible, without regard to the consideration paid or honesty of intent: *Chorpenning's Appeal,* 32 Pa. 315, 316; *Noonan Estate,* 361 Pa. 26, 30, 32, 33, 63 A. 2d 80; *Comerford Estate,* 388 Pa. 278, 295, 130 A. 2d 458; *Downing Estate,* 162 Pa. Superior Ct. 354, 360, 57 A. 2d 710, aff'd. 359 Pa. 534, 535, 59 A. 2d 903.

The purchase of decedent's interest in this partnership by the fiduciary for her own interest was self-dealing which cannot be countenanced and the sale must be set aside. The Act of April 22, 1856, P. L. 532, 12 P.S. §83—a statute of limitations—does not apply in the case at bar where the self-dealing of the fiduciary and fraud so clearly are evident[13] and where the interest sold was an interest in a partnership. The parties intended the transaction as a transfer of personalty and the fact that the sale was accomplished by employment of a deed—perhaps to evade the 1856 Act—does not detract from the evident intent of the parties that the transfer was of personalty, not realty.

This sale was concealed for almost fourteen years from appellants and, in the meantime, the interest acquired by Mrs. Hawkins was transferred *as a gift* to her husband, Lynn Hawkins. Certainly it cannot be contended that Lynn Hawkins is either a bona fide holder of title or a holder who paid any value for such

---

[13] Concealment or deceit, whether before, at the same time or after commission of a fraudulent act, may toll the running of a statute of limitations or the application of laches: *Lutherland, Inc. v. Dahlen,* 357 Pa. 143, 53 A. 2d 143; *Rush v. Butler Fair & Agricultural Association,* 391 Pa. 181, 185, 137 A. 2d 245.

title. Under the circumstances portrayed on this record the sale of this partnership interest was in fraud of appellants and must be set aside. It naturally follows that appellants may have recourse against both the Estate of Mrs. Hawkins and Lynn Hawkins to recover the moneys unlawfully realized by either or both of them from the purchase of appellants' interest by Mrs. Hawkins.

Whether recourse can be had against H. W. Loveland, the Estate of C. M. Oliver, South Penn Oil Company and/or United Refining Company will depend on the bona fides under which they received title and whether they knew or should have known of Mrs. Hawkins self-dealing. Such question remains for resolution in the court below.

Decree reversed and matter remanded to the court below for proceedings consonant with this opinion. Costs on Mrs. Hawkins' Estate.

#### Action To Compel Return of Assets of the Estate of Harriet Miller Hawkins to the Court and for Attachment of the Person of Lynn Hawkins

Mrs. Hawkins died June 10, 1961, and her husband, Lynn A. Hawkins, was appointed executor of her estate. Notice of the appointment was given by due advertisements, the last of which appeared on *July 7, 1961.* Before filing any inventory or accounting in this estate, on *July 9, 1962,* Lynn Hawkins distributed the assets of the estate to the persons entitled under the will of Mrs. Hawkins. Upon learning of this, on August 19, 1963, a proceeding was instituted to require the executor to file an inventory and account and surety bonds and this the court below directed on September 10, 1963. Having failed to abide by the court order as to filing bonds, the court held Lynn Hawkins in contempt. In December 1963 petitions

were filed in the Orphans' Court of McKean County (1) to show cause why the assets distributed under the will of Mrs. Hawkins should not be delivered to the court for further disposition and (2) the person of Lynn Hawkins attached for failure to file the bonds as directed by the court.

In the account, filed under direction of the court, it was shown that distribution had been made to Lynn Hawkins of assets totalling $67,362.47, to Betty Piech (niece) $20,484.08, to Jean P. Healey (niece) $20,-809.08, and to Donna Peebles (niece) $20,484.11 or a total distribution of $129,139.74.

The court below, in dismissing this petition, did so upon the ground that the distribution of assets by Lynn Hawkins as executor was proper and in accordance with Section 732 of the Fiduciaries Act of 1949 (Act of April 18, 1949, P. L. 512, §732, as amended, 20 PS §320.732). The basis of the court's ruling was that appellants had not given any written notice under the statute of their claims against Harriet Hawkins, decedent, either to Lynn Hawkins, her personal representative, or to his attorney of record prior to the distribution of assets of the estate by the executor.

In the two actions—the 1946 action and the 1954 action—Lynn Hawkins, as executor of the estate of Mrs. Hawkins, had been substituted in place of Mrs. Hawkins *by stipulation* and the attorney of record for the estate of Mrs. Hawkins was also the attorney of record for Mrs. Hawkins and Lynn Hawkins in both the 1946 and 1954 actions.

The Act of 1949, supra, provides that a personal representative may, *at his own risk* and without accounting, distribute real or personal property without liability to a claimant who has not given the statutorily required notice within (a) one year after advertisement of grant of letters or (b) thereafter prior to distribution. In construing a similar statute, this

Court said in *Doster Estate,* 346 Pa. 455, 458, 31 A. 2d 142: "Knowledge by a fiduciary of the existence of a contingent claim does not relieve the presumptive creditor of the duty to give notice thereof to the fiduciary under the Fiduciaries Act of 1917. [citing cases]."

However, in the case at bar, Mrs. Hawkins' executor not only knew of the existence of the two claims embodied in the 1946 and 1954 lawsuits, but, *by stipulation,* became, after Mrs. Hawkins' death, a party in both lawsuits as the personal representative of her estate. Moreover, the executor's counsel who so stipulated was not only counsel for Mrs. Hawkins during her lifetime but counsel after her death for the executor in both lawsuits. Furthermore, this counsel knew from correspondence between the court and parties that said claims were being pressed and such notice came to counsel within a year of the death of Mrs. Hawkins. The fact of substitution by stipulation of Mrs. Hawkins' personal representative in the pending litigation of these claims in itself constituted an acknowledgement of notice of the pendency of the two claims.

Section 732 of the Fiduciaries Act of 1949 was intended as a statute of repose of claims of non-diligent creditors and not as a statute whereby legitimate claims, the existence of which both the personal representative and his counsel had acknowledged, could be outlawed.

The concatenation of events which transpired after Mrs. Hawkins' death leads us to believe that they were planned to lull appellants into a sense of security by stipulating the substitution of record in both suits of the personal representative and then *within two days* after the expiration of the year after the last advertisement of the grant of letters and without filing either inventory or account, dispose by way of distribu-

tion of the assets of an estate to which appellants would have recourse if successful in establishing their claims. This Court will not countenance the use of the Act of 1949, supra, as a shield to place assets of an estate beyond the reach of legitimate creditors under the instant factual situation.

It is obvious this distribution was accomplished for the purpose of defeating whatever claims appellants had against Mrs. Hawkins or her estate. The court below fell into grievous error under the instant factual circumstances in finding that neither the personal representative or his counsel had acknowledged notice of appellants' claims.

Order is reversed and the matter is remanded to the court below for the purpose of directing the return to the court by Lynn Hawkins, Betty Piech, Donna Peebles and Betty Healey of all assets distributed to them from Mrs. Hawkins' estate to await final disposition of appellants' claims against that estate and for the further purpose of attaching the person of Lynn Hawkins until such time as he fully abides by the court order of September 10, 1963. Costs on Mrs. Hawkins' Estate.